**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 18-cv-01765-RM-KMT

IRENE PRUITT,

      Plaintiff,

v.

ALAMOSA COUNTY SHERIFF'S OFFICE,
ROBERT JACKSON, Alamosa County Sheriff, in his individual capacity,
JOSHUA HILL, Alamosa County Deputy Sheriff, in his individual capacity,
JOSHUA BAIER, Alamosa County Deputy Sheriff, in his individual capacity,
BRANDON HEREDIA, Alamosa County Deputy Sheriff, in his individual capacity,
PAUL GILLELAND, Alamosa County Deputy Sheriff, in his individual capacity,
MARTIN MAEZ, Alamosa County Deputy Sheriff, in his individual capacity,
NICK SMITH, Alamosa County Deputy Sheriff, in his individual capacity, and
ANGELA LOBATO, Alamosa County Deputy Sheriff, in her individual capacity,

      Defendants.

---

## ORDER

---

This matter is before the Court on Defendant Alamosa County Sheriff's Office ("ACSO"), Robert Jackson, Joshua Baier, Brandon Heredia, Paul Gilleland, Martin Maez, Nick Smith, and Angela Lobato's (collectively, "Defendants") Motion for Summary Judgment (ECF No. 82). Plaintiff has filed a response and a correction (ECF No. 119), while Defendants have filed a reply. In addition, by Order dated November 7, 2019, the Court struck the matters which Plaintiff incorporates by reference in her response brief. (ECF No. 121.) The Motion is fully briefed and ripe for resolution. Upon consideration of the Motion, the applicable parts of the court record, and the applicable law, and being otherwise fully advised, the Court finds and orders as follows.

## I.      BACKGROUND

The case arises because Plaintiff went through labor and gave birth in her jail cell in November 2016 at the Alamosa County Jail ("Jail"). Plaintiff also alleges that while she was pregnant in her jail cell, she was forced to go through severe opiates withdrawal resulting in the preterm delivery of her baby. This occurred due to Defendants' alleged unconstitutional actions for which Plaintiff brings the following claims: (1) deliberate indifference to Plaintiff's serious withdrawal symptoms that occurred while she was pregnant, leading to preterm labor and early delivery; (2) deliberate indifference to Plaintiff going into labor and delivering a child; and (3) a *Monell* claim.[1] Construing the evidence in a light most favorable to Plaintiff, this is what occurred.[2]

In the early morning hours of Friday, November 4, 2016, Plaintiff was arrested for unlawful possession of a controlled substance. At the time of her arrest, Plaintiff was about seven to eight months pregnant and a daily heroin user.

After Plaintiff's arrest, the Alamosa Police Department officers brought her to the San Luis Valley Regional Medical Center ("Medical Center") for medical clearance. Plaintiff advised the Medical Center that she was pregnant and using heroin but had no complaints of problems with her pregnancy. The medical staff at the Medical Center found nothing to suggest any problems with Plaintiff's pregnancy; therefore, Plaintiff was medically cleared to be booked into the Jail and provided with "After Care Instructions." The After Care Instructions had generic instructions about what not to do during a pregnancy, e.g., stop any smoking, avoid alcohol and drugs, and keep hydrated. The After Care Instructions also stated for Plaintiff to get help right

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).
[2] The Court finds that on many occasions Plaintiff misstated or misrepresented the evidence. The Court only sets forth facts which the record could reasonably support.

away if she experienced pain, cramping, vaginal bleeding, nausea/vomiting, dizziness/lightheadedness, or passing out.[3]

The Alamosa Police Department officers then brought Plaintiff to Jail where she was booked that morning, November 4, at about 2:05 a.m., and placed in a holding cell. This was Plaintiff's third time in the Jail that year while pregnant. She was previously booked into Jail on May 13 and June 5, 2016, while she was approximately three and four months pregnant, respectively. There were apparently no material issues associated with those confinements.

The Jail contains a control room, a booking area, holding cells, and several pods.[4] The Jail also has different work shifts. On a night (graveyard) shift, there were three general positions: patrolling, booking, and control room.[5] The booking office has a door and is about 20 feet from the holding cells.

On November 6, Plaintiff gave birth to her third daughter in her cell. Between the time she was booked and the time she gave birth, various Individual Defendants,[6] and Defendant Hill, were working at the Jail at different times. It is undisputed the deputies at the Jail were not capable of distinguishing between signs of labor and signs of withdrawal; Plaintiff also admits it is near-impossible for even a medical provider to distinguish between symptoms of withdrawal and symptoms of labor.[7] When the various Individual Defendants worked at the Jail, who were

---

[3] ECF No. 98-24, p. 1.
[4] ECF No. 98-11, pp. 24-25.
[5] ECF No. 98-11, pp. 61-62.
[6] The Individual Defendants at issue are movants Joshua Baier, Brandon Heredia, Paul Gilleland, Martin Maez, Nick Smith, and Angela Lobato. Even though Plaintiff also includes Defendant Hill (see Response, footnote 2), he filed a separate Motion for Summary Judgment which the Court has addressed by separate order.
[7] ECF No. 98-6, 106:16-107:4; OSUMF ¶34.

  As used in this Order, MSUMF, OSUMF, and RSUMF refer to the columns set forth in the Statement of Undisputed Material Facts (ECF No. 117). Where "SUMF" is used, it refers to all three columns of the referenced row. Thus, "SUMF ¶41" refers to the factual statements in all three columns of row 41 at ECF No. 117.

in other holding cells, and what the evidence shows between the time Plaintiff was booked and delivered her baby are as follows.

### The Individual Defendants and Defendant Hill.[8]

Defendants Hill and Heredia were deputies who worked the night shift in the Jail from 5:00 p.m. until 5:00 a.m. on 11/3-11/4 (Thursday night into Friday morning), 11/4-11/5 (Friday night into Saturday morning), and 11/5-11/6 (Saturday night into Sunday morning).

Defendant Lobato, a deputy, worked from 5:00 a.m. until 5:30 p.m. on November 4, 2016. She was off for the rest of the relevant time period.

Defendant Smith was another deputy; he worked in transports, transporting pretrial detainees to court and handling other matters. He worked on November 4 from 8:00 a.m.-5:00 p.m. He did not work during any other relevant time period.[9]

Nurse Bleakney worked for the Jail. She worked on November 4 from 8:00-9:00 a.m. until 5:00-6:00 p.m. She did not work again until Monday, November 7, 2016. She typically worked four 10-hour shifts on all weekdays except for Thursdays.[10]

Defendant Gilleland, a deputy, worked from 10:00 p.m. to 8:00 a.m. on 11/3-11/4 and from 3:00 p.m.-1:00 a.m. on 11/4/-11/5. He was thereafter off work during the relevant time period.

Defendant Maez, a sergeant, worked from 5:00 p.m. to 1:00 a.m. on 11/4-11/5, and was off for the rest of the relevant time period.

---

[8] The Court discusses Defendant Hill to the extent necessary to provide context to the events and as to the municipal liability claim.
[9] MSUMF/OSUMF at 38; ECF No. 98-4. (Copy of ECF No. 98-4 attached.)
[10] OSUMF/RSUMF at 22.

Defendant Baier, a corporal, worked the night shift from 7:00 p.m. to 5:00 a.m. on 11/4 to 11/5 and 11/5 to 11/6.[11]

Defendant Jackson, the Sheriff, did not work at the Jail at any of the relevant time period; Plaintiff had no interactions with him.[12]

### The Other Inmates in the Holding Cells.

During the relevant time period, there were two other inmates in the holding cells, Theodora Travers and Brian Cooper.

### Friday, November 4, 2016.

As stated, Plaintiff was booked at the Jail about 2:05 a.m. At about noon on November 4, because Plaintiff was pregnant, withdrawing, and complaining more than she did on her previous stays in the Jail, Defendant Lobato took Plaintiff to see Nurse Bleakney.[13] Nurse Bleakney's office was located in the booking area, with some of the holding cells right outside her door. She could "hear everything all day long."[14] Plaintiff advised Nurse Bleakney that she was pregnant and using heroin. Nurse Bleakney completed an "Inmate medical evaluation" and made findings that Plaintiff was at risk for preterm labor due to withdrawal.[15] The evaluation set forth Nurse Bleakney's plan of care for Plaintiff.

Defendant Lobato was also aware that Plaintiff was sweating and had been vomiting.[16] Sometime between approximately 3:43 p.m. and 5:00 p.m., Defendant Lobato took Plaintiff to have a shower.[17] According to Plaintiff, Defendant Smith appeared at the end of her two-minute

---

[11] ECF No. 98-9, p. 170.
[12] MSUMF/OSUMF at 20.
[13] ECF No. 98-20, pp. 163-64.
[14] ECF No. 98-6, 71:16-24.
[15] ECF No. 81-6, p. 3; No. 98-6, 88:22-89:13.
[16] ECF No. 98-20, 184:5-20, 185:6-11, 188:8-13, 192:4-13.
[17] There is some issue of when Defendant Lobato took Plaintiff to have a shower. Defendant Lobato testified that she took Plaintiff after seeing Nurse Bleakney. (ECF No. 98-20, 117:20-25.) But, according to Plaintiff, her shower

shower and was there when the door to the shower opened. Plaintiff did not vomit or have the runs while she was in the shower; however, she was crying, saying she was not feeling well.[18]

Later that same day, Nurse Bleakney stopped by Plaintiff's holding cell and checked on her.[19] Nurse Bleakney observed no signs of withdrawal while she was there that day; she left sometime about 5:00-6:00 p.m.[20] At some point on November 4, Nurse Bleakney went to the booking area and told a "group"[21, 22] of deputies that if Plaintiff said anything about going into labor or was in distress, they needed to call 911. She then relied on this "group" to relay it to the other deputies.[23]

According to Plaintiff, beginning in the evening of November 4, she began to exhibit signs of distress from withdrawal.[24] Plaintiff agrees there was no requirement that she be taken to the hospital until she began to experience the physical symptoms of withdrawal on the *evening* on November 4, 2016.[25]

---

was between 3:43 p.m. and 5:00 p.m. (OSUMF at 46.) Construing the facts in the light most favorable to Plaintiff, the Court assumes for the purposes of the Motion that this shower occurred between 3:43 p.m. and 5:00 p.m.

[18] ECF No. 84-1, pp. 137-142, 243-245. Defendant Smith and Lobato testified that he (Smith) was not at the shower but the Court accepts Plaintiff's version for the purposes of the Motion – that Defendant Smith appeared at the end of Plaintiff's shower.

The Court notes that, on a few occasions, Plaintiff contradicts her own testimony. As Defendants argue, Plaintiff cannot create a genuine dispute of material fact by her own contradictory statements. "The law is clear…that self-contradicting statements do not create an issue surviving summary judgment." *Johnson v. Allis-Chalmers Corp. Prod. Liab. Tr.*, 11 F. Supp. 3d 1119, 1131 n.5 (D. Wyo. 2014) (collecting cases). Nor can Plaintiff create issues which preclude summary judgment by providing evidence from others which contradict her own statements and the record as a whole. (Compare, e.g., ECF No. 98-1, 138:2-7 (Plaintiff testified that Defendant Lobato took her to take a shower) and No. 98-20, 182:18-20 (Defendant Lobato testified that only she took Plaintiff to the shower) with ECF No. 98-10, ¶10 (Travers' Affidavit stating that Defendants Smith *and* Lobato took Plaintiff to the shower).) *See York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir. 2008) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" (quotation marks and citation omitted, brackets in original)).

[19] Nurse Bleakney is uncertain about what time this occurred. (ECF No. 98-6, 131:4-25.)

[20] ECF No. 98-6, 131:20-132:9.

[21] ECF No. 98-6, 16:2-10.

[22] Nurse Bleakney's Affidavit referred to the group as "jail staff." (ECF No. 98-5,¶¶51, 54.)

[23] There is some testimony as to whether Nurse Bleakney only said "labor" or only meant labor. But the Court must construe the facts in the light most favorable to Plaintiff. (See ECF No. 98-6, pp. 94, 96-97.)

[24] ECF No. 103, p. 3; OSUMF at 32.

[25] OSUMF at 32.

At about 5:30 p.m. on November 4, Defendant Maez saw that Plaintiff had vomit in her hair and turtle suit[26] and asked a deputy to take Plaintiff to have a shower.[27] It is "possible" that deputy was Defendant Gilleland, as he was on duty and has no recollection one way or the other. However, it is also "possible" that it was not him.

During Baier's night shift, he worked on the jail floor and in the booking area.

***Saturday, November 5, 2016.***

On November 5, Plaintiff was sick; she yelled for Defendant Maez, asking if she could use the bathroom. She yelled loud enough so that someone could hopefully hear her; that she didn't feel good, needed to use the bathroom because she had the runs, and needed a shower.[28] Plaintiff was taken out of her cell a couple of times to use the restroom, but she kept needing the restroom and "they" would say they already let her use it, to use the drain in her cell, or to hold it because they were serving dinner.[29] Nonetheless, Plaintiff was moved a couple of times because her room was a mess from not being able to get to a bathroom. According to Plaintiff, Deputy Hall gave her clean clothes, blankets and let her shower.[30] By midday, Plaintiff was in full-blown withdrawal, but she had stomach pain that she never had with withdrawals before and started thinking maybe she was in labor.[31] Plaintiff can't say when the withdrawal cramps turned into

---

[26] ECF No. 98-13, 245:7-246:15.
   Some parties called it a turtle suit; others called it a paper suit. In either case, the "suit" was used for inmates on suicide watch. (*See* ECF No. 98-13, 93:16-22.)
[27] ECF No. 98-13, 246:2-25.
   Plaintiff argues there is a factual dispute over whether she received one or two showers, relying primarily on the declaration of Ms. Travers. From Ms. Traver's declaration, it sounds like there was only one shower, which involved Defendants Lobato, Smith, and Maez. However, based on the work shift of these three individuals, that could not have occurred, i.e., Smith's shift ended at 5:00 p.m. and Maez's shift began at 5:00 p.m., and there is no evidence that Smith's shift ended later or Maez's shift started earlier. Moreover, Plaintiff stated that Defendant Smith was at her shower between 3:43 p.m. and 5:00 p.m. And the evidence shows Defendant Maez allowed Plaintiff a shower about 5:30 p.m.
[28] ECF No. 98-1, 146-149.
[29] Id.
[30] ECF No. 98-1, 156:19-157:15. Deputy Hall is not a defendant; in fact, he was not working during the relevant time period. (ECF No. 98-4.)
[31] ECF No. 98-1, 150:23-25.

labor.[32] She wasn't certain if she was having contractions or if something was wrong with the baby.[33] Towards the evening, right around dinner time, Plaintiff called out "I think I need to go to the hospital," "something is wrong," or similar words on many occasions.[34] Plaintiff testified that "they" kept saying that she was a liar because everyone says they need to go to the hospital.[35] According to Ms. Travers, she overheard some deputies say "Don't worry, she's not going into labor. She's not due for weeks."[36]

Defendant Hill worked from 5:00 pm to 5:00 a.m. on his 11/5-11/6 night shift, he heard Plaintiff crying hysterically and closed the booking room door.[37] Defendant Heredia worked in the control room during his evening shift.[38]

### Sunday, November 6, 2016.

On November 6, Plaintiff began getting a little more aggressive in asking for help; she went more frequently to her door, saying something was wrong, she knows it's not withdrawals, to please help.[39] Plaintiff had no clothes on because she was waiting for clean clothes; her blankets were wet from vomit.[40] Shortly before 4:00 a.m. Defendant Baier opened Plaintiff's cell door, spoke with Plaintiff for about 10-15 seconds where he said he was going to call an ambulance but that if Plaintiff was lying that he was going to charge her with some kind of felony or something. He then slammed the door and left.[41] Plaintiff gave birth right after Defendant Baier left her cell.[42] She heard somebody say "Fuck, there's a baby, she had the

---

[32] ECF No. 98-1, 151:7-18.
[33] ECF No. 98-1, 151:19-25.
[34] ECF No. 98-1, 151-153, 205:24-206:18
[35] ECF No. 98-1, p. 152.
[36] ECF No. 98-10, ¶17.
[37] ECF No. 98-3, 194:12-21.
[38] ECF No. 98-11, pp. 126-129, 132.
[39] ECF No. 98-11, 158:2-22.
[40] ECF No. 98-1, 158:2-11.
[41] ECF No. 98-1, pp. 158-160, 162-63.
[42] ECF No. 98-1, p. 160.

baby," or something like that. Then, Defendant Baier came back into Plaintiff's cell[43]; Ms. Travers was let out of her cell to assist Plaintiff.[44] The EMS arrived, and Plaintiff and her baby were transported from the Jail to the hospital by ambulance. This lawsuit followed.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569-70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248.

Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

---

[43] ECF No. 98-1, p. 160.
[44] ECF No. 98-10, ¶22.

fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). "[T]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (quotation marks and ellipsis omitted). The facts, however, must be considered in the light most favorable to the nonmoving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

### B.  Qualified Immunity

Qualified immunity shields individual defendants named in § 1983 actions unless their conduct was unreasonable in light of clearly established law at the time of the alleged constitutional violation. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The district court may address the steps in either order. *Carabajal v. City of Cheyenne, Wy.*, 847 F3d 1203, 1208 (10th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). If the plaintiff fails to satisfy either part of her burden, the court must grant qualified immunity. *Id.*

### C.  Deliberate Indifference

The test for constitutional liability of prison officials for deliberate indifference to an inmate's or pretrial detainee's serious medical needs involves both an objective and a subjective component. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). A plaintiff must satisfy both components. *Rife v. Oklahoma Dept. of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). To

satisfy the objective component, a medical need must be either sufficiently serious that it has

been diagnosed by a physician as mandating treatment or so obvious that even a lay person

would easily recognize the necessity for a doctor's attention. *Oxendine v. Kaplan*, 241 F.3d

1272, 1276 (10th Cir. 2001). For claims involving a delay in receiving medical care, the plaintiff

must show that the delay resulted in substantial harm. *Id.* To satisfy the subjective component,

the plaintiff must show that the prison official knew of and disregarded an excessive risk to

plaintiff's health or safety by failing to take reasonable measures to abate it. *Id.*; *Sealock*, 218

F.3d at 1209. "[T]he official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Mata

v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (brackets omitted) (quoting *Farmer v. Brennan*, 511

U.S. 825, 837 (1994)).

### D.  Expert Reports

Plaintiff submits unsworn expert reports in support of her response. (ECF No. 98-21,

Exhibit 21 (Dr. Tubbs) & ECF No. 104-5, Exhibit 29 (Dr. Walsh).) Defendants object to the

reports arguing they are hearsay. (RSUMF, e.g., at 26, 27.) In order to survive summary

judgment, the content of the evidence that the nonmoving party points to must be admissible.

*Adams v. Am. Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). *See also*

Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence.").

Rule 56 of the Federal Rules of Civil Procedure was amended in 2010. Prior to that date,

generally, an unsworn expert report was not competent evidence for summary judgment motions.

Since 2010, courts in this District, and in other districts and circuits, have reached varying

conclusions as to whether this is still so. *See, e.g., Smith v. Palafox*, 728 F. App'x 270, 275-76

(5th Cir. 2018) (district court did not err in excluding expert reports where they were unsworn, were not made under penalties of perjury, or proponent failed to explain how the reports could be reduced to admissible evidence at trial); *Sanchez v. Hartley*, 299 F. Supp. 3d 1166, 1181 n.11 (D. Colo. 2017) (stating cases requiring sworn expert reports have been abrogated on this point by the 2010 amendments to Rule 56. The Tenth Circuit, however, albeit in an unpublished decision,[45] has stated that "unsworn expert reports are not competent evidence on summary judgment." *Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015) (citing to Fed. R. Civ. P. 56(c)(4)).

In this case, the expert reports are unsworn (supported by neither an affidavit nor an unsworn declaration under 28 U.S.C. § 1746); in fact, the report of Dr. Walsh is even unsigned.[46] Thus, they are not competent evidence. Moreover, even assuming the reports were not required to be sworn, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments). This, Plaintiff fails to do.[47] Accordingly, they will not be considered. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), as amended on reh'g (Nov. 8, 2016) (Declining to consider letter or contents where proponent failed to meet "[t]he requirement…that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." (quotation marks and citation omitted)).

---

[45] Under 10th Cir. R. 32.1, "[u]npublished cases are not precedential, but may be cited for their persuasive value."
[46] ECF No. 104-5, p. 4.
[47] The Court notes both experts are from other states.

### III.    DISCUSSION

#### A.  Qualified Immunity

##### 1.  Constitutional Violation

###### a)  Personal Participation

Defendants contend Defendants Jackson, Smith, and Gilleland are entitled to summary judgment because they did not personally participate in any alleged constitutional violation. The Court addresses each in turn.

*Defendant Jackson*. From Plaintiff's response brief, it does not appear that she is suing Defendant Jackson in his personal capacity. To the extent Plaintiff does, there is no evidence of any personal participation by Defendant Jackson in any of the actions complained of. Accordingly, Defendant Jackson, in his personal capacity, is entitled to summary judgment.

*Defendants Smith and Gilleland.* Because Defendants Smith and Gilleland did have interactions with Plaintiff, the Court finds any analysis of their involvement is better addressed under the deliberate indifference prong set forth below.

###### b)  Objective Component.

Defendants' Motion raises two arguments concerning the objective component. First, Defendants argue that to the extent Plaintiff's claims are predicated on the general condition of heroin withdrawal and pregnancy, they fail to establish the objective component. In response, Plaintiff argues that is not the harm claimed, instead it is "withdrawals while pregnant, leading to pre-term labor and early delivery."[48] Thus the harm which Defendants argue is insufficient is not at issue.[49]

---

[48] ECF No. 103, p. 8.
[49] In their reply brief, Defendants argue that Plaintiff's harm in her first cause of action of "experiencing withdrawal while pregnant" fails to satisfy the objective component. But Defendants did not raise this in their Motion and the

Next, Defendants argue the delay in getting Plaintiff medical care did not cause her substantial harm, relying on the argument that (1) Plaintiff went through heroin withdrawal on her own when not confined in jail and went through heroin withdrawal in May and June 2016 while in Jail without medical assistance; (2) there is no medical evidence that Plaintiff suffered pain due to giving birth in jail to her third daughter that was any different than in giving birth to her second daughter while going through heroin withdrawal; and (3) there is no medical evidence to substantiate Plaintiff suffered physical injury and anxiety as a result of giving birth in jail. As Plaintiff argues, Defendants' arguments miss the mark. The issue is not what pain or harm Plaintiff may have suffered on any other occasion. The issue is whether Plaintiff suffered substantial harm while in Jail in Defendants' alleged care. And, here, Plaintiff's testimony regarding the pain she suffered, as exhibited by her vomiting and hysterical crying, while going through withdrawals while pregnant is sufficient to withstand Defendants' motion for summary judgment. *See Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (considerable harm may be satisfied by considerable pain, pain experienced while waiting for treatment and analgesics).

### c) Subjective Component

Defendants assert Plaintiff cannot establish the subjective component because there is no evidence that the withdrawal symptoms she experienced in November 2016 were different from what she typically experienced or that she advised jail staff that her withdrawal symptoms were different. Instead, Defendants assert, Plaintiff's heroin withdrawal was not a condition of which Defendants had actual knowledge that Plaintiff faced a substantial risk of harm and, despite that knowledge, disregarded the risk by failing to take reasonable measures to abate it. And, further,

---

Court does not find it is proper reply when such harm was specifically identified in the Second Amended Complaint. (ECF No. 56, p. 9.) Accordingly, it will not be considered.

Plaintiff's pregnancy was not a condition of which Defendants had actual knowledge that Plaintiff faced a substantial risk of harm and, despite that knowledge, disregarded the risk by failing to take reasonable measures to abate it.

Plaintiff responds[50] that the Individual Defendants – as gatekeepers – knew she required medical care and refused to let her get it. First, Plaintiff contends the Individual Defendants knew because:

- As to all Individual Defendants, it was obvious that a person who is eight months pregnant and experiencing the distress of withdrawal or labor needs to see a doctor;

- As to Defendants Heredia, Gilleland, Lobato, and Maez, because Nurse Bleakney told them;

- As to the other Individual Defendants (Smith and Baier),[51] they learned of Nurse Bleakney's instructions when they came on shift by either participating in the shift change briefing or were updated by others (i.e., by Lobato, Maez, Heredia, and Gilleland); and

- As to Defendants Smith and Gilleland, Defendant Lobato told them while they were on shift with her.

Next, Plaintiff contends the Individual Defendants knew because they saw and heard Plaintiff experiencing the signs of labor or withdrawal because she was extremely vocal from the evening of November 4 through the morning of November 5. Each of the Individual Defendants allegedly heard her crying, vomiting, defecating, statements to that effect, and cries that she was in pain. And that she was even more vocal from the evening of November 5 through the morning of November 6 when she gave birth, including statements that she was in labor and that

---

[50] Plaintiff frequently indiscriminately groups all Individual Defendants, and Defendant Hill, together in her arguments. Plaintiff, however, is required to meet her burden as to each Individual Defendant. Because she does address, and make arguments, in the statement of undisputed material facts, the Court examines them as to each Individual Defendant to determine if they support her arguments as to any such Defendant.

[51] As stated, Defendant Hill is not a party to the Motion as he filed a separate Motion for Summary Judgment which the Court addressed separately.

something was wrong with the baby. The Court examines the record to see if this is so, as to each Individual Defendant.[52]

***Defendant Smith***. Defendant Smith worked transport duty on November 4, but he finished any transporting duties about 3:43 p.m. At most, Plaintiff had one brief interaction with Defendant Smith in the afternoon of November 4, sometime between 3:43 p.m. and 5:00 p.m.[53] Specifically, Defendant Lobato took Plaintiff to take a shower, the shower was turned off, and the door was opened where Defendants Lobato and Smith stood.[54] Plaintiff was crying and saying she did not feel well; she didn't have any clothes on and hurried to get dressed. According to Plaintiff, Defendant Smith told her to hurry up, and he didn't "give a shit" if she was pregnant or not.[55] Plaintiff, however, did not vomit or have the runs in the shower, but she did have to go to the toilet after the shower when Defendant Smith was present.[56]

By Plaintiff's own admission she did not begin to exhibit signs of distress until the *evening* of November 4; therefore, after Defendant Smith's brief interaction with Plaintiff in the shower that afternoon.[57] Moreover, although Plaintiff argues Defendant Smith took her back to her cell and saw it was not cleaned of vomit and diarrhea, the evidence she cites does not support this contention. First, none of the record Plaintiff cites shows who took Plaintiff back to her cell. And, Plaintiff's reliance on Ms. Travers' affidavit that it must have been Defendant Smith is

---

[52] Other than Defendant Jackson, in his personal capacity, whom the Court already addressed.

[53] Defendant Smith returned to Jail at 3:43 p.m. and remained at the Jail until 5:00 p.m. and Defendant Lobato was on duty until 5:30 p.m. (ECF No. 98-4; SUMF at 41.)

[54] There is a material factual dispute as to whether Defendant Smith assisted Defendant Lobato at the end of Plaintiff's shower. Defendants Smith and Lobato testified that Defendant Smith did not. Plaintiff provides contrary evidence. As the Court construes the evidence in the light most favorable to Plaintiff, the Court assumes Defendant Smith did assist for the purposes of this Motion. See also n.18.

[55] Ex. 84-1, pp. 137-142.

[56] Plaintiff asserts Defendant Smith escorted Plaintiff to and from the shower while she was suffering through withdrawal, but the evidence she cites does not support such assertion. See also n.18.

[57] According to Plaintiff, she started withdrawing within about 12 hours of being in Jail; her typical pattern. (ECF No. 98-1, 133:5-10.) Thus, within around 2:00 p.m., but she admits she didn't exhibit signs of distress until the evening. And, Defendant Smith's shift ended at the same time or before Nurse Bleakney's and she was unaware of any signs of distress which required medical care before she left for the day.

unavailing because Ms. Travers says that Defendant Maez asked her to clean Plaintiff's cell while Plaintiff was in the shower.[58] Defendants Smith and Maez, however, were not on duty at the same time; thus, it could not have been Defendant Smith who brought Plaintiff back to her cell.[59] The Court finds this record is insufficient to create a jury question that Defendant Smith knew of and disregarded an excessive risk to Plaintiff's health or safety by failing to take reasonable measures to abate it. Accordingly, Plaintiff fails to meet her burden of demonstrating Defendant Smith violated her constitutional right.[60]

**_Defendant Gilleland_**. The same holds true for Defendant Gilleland. Defendant Gilleland worked the 10:00 p.m.-8:00 a.m. shift on 11/3-11/4 and the 3:00 p.m-1:00 a.m. shift on 11/4-11/5. Defendant Gilleland was working when Plaintiff was brought in during the early morning hours of November 4, but she was not exhibiting heroin withdrawal symptoms and was not in labor when his shift ended at 8:00 a.m. that morning.[61]

During his afternoon/evening shift, Defendant Gilleland did cell checks and noted that Plaintiff refused her evening meal, which would have been around 6:00 p.m.[62] Plaintiff recalls no interactions with him and does not know why he is a defendant.[63] Nonetheless, Plaintiff asserts that Defendant Gilleland is liable because he was working in the Jail (1) it is "possible" that he was the deputy who took Plaintiff to the shower and back around 5:30 p.m. at the request of

---

[58] ECF No. 98-10, ¶14.

[59] Further, Plaintiff argues Defendant Smith took her back to her cell where she immediately when to the toilet, but Ms. Travers says that Plaintiff's cell did not have a sink or toilet. (Compare OSUMF at ¶16 with ECF No. 98-10, ¶13.) And, the video which Plaintiff submits to the Court confirms this fact.

[60] The Court also finds Plaintiff fails to provide sufficient evidence to create a factual issue that Nurse Bleakney and Defendant Lobato told Defendant Smith that Plaintiff was at risk for preterm labor and needed to go to the doctor if she exhibited signs of distress. Nurse Bleakney never identified Defendant Smith as someone to whom she gave information; indeed, she does not recall whom except for Defendant Lobato. Defendant Lobato testified that she had no interactions with Defendant Smith on November 4. (ECF No. 98-20, 188:17-25.) Nor could it be said that, based on the facts of which he was aware, the risk of harm was obvious.

[61] SUMF ¶70.

[62] ECF No. 104-7, pp. 97-98.

[63] SUMF ¶21.

Defendant Maez when she had vomited; (2) he served dinner and Plaintiff refused hers; (3) it may be inferred that he heard Plaintiff crying hysterically during his shift because Defendant Hill did; (4) because Nurse Bleakney said she told a "group" of deputies that Plaintiff was pregnant and at risk for preterm labor (but the only one she could recall telling was Defendant Lobato and, perhaps, Defendant Maez[64]); and (5) because Defendant Lobato knew Plaintiff was at-risk for preterm and told unknown and unidentified "other people" she was working with Plaintiff was at risk.[65]

　　　　To start, awareness cannot be based on possibilities or speculation as to who knew what or who told whom what, when it is unknown when and where something was said or told.[66] Next, the fact that Defendant Gilleland knew Plaintiff refused her dinner, without more, is similarly insufficient especially where Plaintiff can recall no contact with him at all. As to what Nurse Bleakney and Defendant Lobato told unknown "others," that too is insufficient to show that *Defendant Gilleland* was one of these others. Plaintiff's crying during the evening of November 4, which others heard, however, is circumstantial evidence sufficient to create a factual issue of whether Defendant Gilleland also heard any crying during his checks. But, even assuming Defendant Gilleland heard Plaintiff crying hysterically sometime during the evening of Defendant Gilleland's 3:00 p.m. and 1:00 a.m. shift, the Court finds this is insufficient to create a factual issue of whether he was aware of sufficient facts from which the inference could be drawn that a substantial risk of serious harm to Plaintiff exists, *and* that he also drew the inference. Unlike Defendant Hill, there is insufficient evidence that Defendant Gilleland was

---

[64] Plaintiff submits the Affidavit of Nurse Bleakney which places Defendant Maez at the Jail during her workday. However, Nurse Bleakney's deposition testimony shows she was uncertain. Construing the facts in the light most favorable to Plaintiff, the Court assumes they crossed paths during the 5:00-6:00 p.m. time frame on November 4, when their workday may have overlapped.
[65] ECF No. 98-20, 171:3-15.
[66] For example, given Defendant Lobato's work shift on November 4, including people working on transport, she worked with up to 14 people at various times that day. (ECF No. 98-4.)

working in the booking area, heard constant crying, and closed the booking room door to avoid the noise – or that Defendant Gilleland was aware of Defendant Hill's actions. *See Harte v. Bd. of Comm'rs of Cty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017) (The court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it.").

*Defendant Lobato*. Defendant Lobato worked the 5:00 a.m.-5:30 p.m. shift on November 4.[67] Defendant Lobato was aware that pregnant women who were going through withdrawals were at risk for preterm labor. However, the evidence is insufficient to show that Plaintiff's withdrawal symptoms during Defendant Lobato's shift, and of which she was aware, was such that Plaintiff needed to go to the hospital or that she faced a substantial risk of harm. Indeed, Nurse Bleakney was present during the afternoon and left between 5:00-6:00 p.m., about the same time Defendant Lobato left (5:30 p.m.), without indicating Plaintiff was then in need of any medical care *and* Plaintiff asserts she did not begin to exhibit signs of distress – or needed to go the hospital – until beginning in the evening of November 4. Thus, to the extent that Defendant Lobato owed any duty to Plaintiff to provide her any care that day, she did so when she took Plaintiff to go see Nurse Bleakney (around noon) and took her to shower and change her clothes (between 3:43 p.m. and 5:00 p.m.).[68] On this record, it cannot be said that Defendant Lobato knew of and disregarded any excessive risk to Plaintiff's health or safety.

*Defendant Baier.* When Defendant Baier came onto his 7:00 p.m. shift the night of November 4, an unidentified deputy told him that Plaintiff was seven months pregnant and going

---

[67] ECF No. 98-4.
[68] If Defendant Smith helped Defendant Lobato, as Plaintiff asserts, then the shower would have occurred after his transport duties ended (3:43 p.m.) and before the end of his shift (5:00 p.m.).

to be withdrawing from heroin.[69] According to Defendant Baier, when he arrived for work, Plaintiff was not making any noise.[70] He does not recall any interactions with Plaintiff or hearing anything from Plaintiff at all during his 11/4-11/5 or 11/5-11/6 shift.[71]

But, from November 4-5, Defendant Baier also worked in the booking area and, according to Defendant Hill, Plaintiff constantly cried hysterically. And, Defendant Baier and Hill were together most of the night during the 11/5-11/6 shift,[72] and Defendant Hill said Plaintiff was still crying hysterically then. The other two inmates also heard Plaintiff crying. In addition, Defendant Baier was aware that if a pregnant person goes through withdrawals, it puts the person at risk for preterm labor.[73] Such facts are sufficient to create a genuine issue of material fact as to whether Defendant Baier also heard Plaintiff constantly crying hysterically and thus aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and also whether he drew the inference. On this record, the Court cannot say the evidence points only one way and no reasonable inferences could support Plaintiff's position.

This also holds true for Plaintiff's second claim based on deliberate indifference to her labor and delivery in jail. Starting by at least sometime during the evening of November 5, Plaintiff was crying that something was wrong with her baby and that she thought she needed to go to the hospital. While Defendant Baier testified he did not hear or does not recall hearing Plaintiff making such cries, there is sufficient circumstantial evidence to create a genuine dispute of material fact on this question. And, a jury could reject Defendant Baier's testimony that he did not hear and find he did. Whether he drew the inference there was a substantial risk of labor is

---

[69] ECF No. 98-9, p. 173. He worked with Defendant Heredia and Hill but does not recall who told him this information.
[70] ECF No. 98-9, p. 174.
[71] ECF No. 98-9, pp. 179-181, 184-86.
[72] ECF No. 98-9, p. 186-87.
[73] ECF No. 98-9, p. 163.

also a question for the factfinder in light of Defendant Baier's knowledge regarding Plaintiff's risk for preterm labor and the dispute over whether it was Defendant Baier and Hill (the only two deputies on the floor during this shift) who commented that Plaintiff was not at risk because she wasn't due for weeks.

**_Defendant Heredia._** Defendant Heredia worked the night shift during the relevant time period: 11/3-11/4, 11/4-11/5, and 11/5-11/6. During the 11/4-11/5 shift Defendant Heredia started in the control room from 5:00 p.m. until about 10:00 p.m., then switched to the floor sometime after 10:00 p.m. until 5:00 a.m.[74] When he was working on the floor, he would have had some interactions and observations with Plaintiff in the holding cell. When he did the head count, he would have lifted the cardboard up on her cell and laid eyes on Plaintiff. He would have been doing rounds and if Plaintiff was making noise and complaining, banging, or asking for help, he would have heard it.[75] And, according to Defendant Hill and the other two inmates in the holding cells, Plaintiff did make noise and was complaining. And, further, the video of Plaintiff in her cell showed her in severe distress. Thus, Plaintiff has presented sufficient evidence to create a factual issue as to whether Defendant Heredia was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also whether he drew that inference.[76]

As to the second claim, during his 11/5-11/6 shift, Defendant Heredia worked in the control room where he could not hear the holding cells. Because of the lack of audio, the deputy assigned to the control room was required to pay close attention to the video feeds coming from

---

[74] ECF No. 98-11, pp. 126-129, 132.
[75] ECF No. 98-11, pp. 129-130.
[76] As with the other Individual Defendants, other than Defendant Lobato and Maez, the Court finds Plaintiff fails to provide sufficient evidence from which a reasonable jury could rationally find that Nurse Bleakney told Defendant Heredia of the risk of preterm labor. But the harm claimed is more than just preterm labor.

the holding cells. Relying on a video of Plaintiff shortly before she gave birth, Plaintiff contends

that Defendant Heredia watched her going through contractions, knew she was going into labor,

but did nothing. The Court's review of the video shows that while it was clear that Plaintiff was

suffering from severe distress and pain, it finds a reasonable jury could not conclude that

Defendant Heredia was aware of facts from which the inference could be drawn that a substantial

risk of serious harm of labor existed, and that he also drew that inference. The Court may have

reached a contrary result had there been some evidence that Defendant Heredia was aware of

Plaintiff's cries that she needed to go to the hospital or that something was wrong with the baby.

But the evidence shows Defendant Heredia could not hear the holding cells from the control

room.

   ***Defendant Maez.*** Defendant Maez worked from 5:00 p.m. until 1:00 a.m. from 11/4-

11/5. Whether Nurse Bleakney gave Defendant Maez information concerning Plaintiff's care is

disputed. Nurse Bleakney herself is uncertain. She provided an affidavit that she informed the

"jail staff" of Plaintiff's plan of care, specifically identifying Defendant Maez. In addition, Nurse

Bleakney's affidavit stated she informed Defendant Maez that if jail staff observed signs of

distress, they needed to call 911 and get Plaintiff to the hospital.[77] However, in her subsequent

deposition, Nurse Maez was uncertain whether she gave Defendant Maez directions.[78] And,

Defendant Maze recalls none.[79] Regardless, Defendant Maez heard Plaintiff vomit, saw dark

green vomit on her hair and cell, and asked if she wanted to take a shower.[80] At that time, she did

not complain of pain in her abdomen, pain or cramping in her belly or pelvis, vaginal bleeding,

---

[77] ECF No. 98-5, ¶ 51.
[78] ECF No. 98-6, 158:22-160:1.
[79] ECF No. 98-13, 208:11-24.
[80] ECF No. 98-13, 193:17-23, 250:19-251:1.

dizziness/lightheadedness; she did not ask to go see a doctor or to go to the hospital.[81] But, dark green vomit is a common color Defendant Maez saw with withdrawals.[82] And although Defendant Maez had no ability to distinguish between symptoms of withdrawal and labor, he was aware that a woman who is pregnant and withdrawing is at a heightened risk for preterm labor. Plus, the symptoms he saw with withdrawal would make him concerned for preterm labor.[83] However, Defendant Maez took no action. On this record, the Court finds there are genuine issues of material fact whether Defendant Maez was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that he also drew the inference.

### 2. Violation of "Clearly Established" Right

The Individual Defendants, sued in their individual capacities, argue they are entitled to qualified immunity. As stated, when a defendant raises qualified immunity at summary judgment, the burden shifts to plaintiff to show, as to each defendant, (1) that the defendant's actions violated a federal constitutional or statutory right and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Estate of Booker*, 745 F.3d at 411.

> To qualify as clearly established, a constitutional right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."… A case clearly establishes a right "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains." … And although there need not be a case precisely on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." …  This high bar ensures qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." …
>
> And it is a "longstanding principle that clearly established law should not be defined at a high level of generality." … The "dispositive question is whether the violative nature of particular conduct is clearly established." …  We therefore

---

[81] ECF No. 98-13, pp. 248-50.
[82] ECF No. 98-13, 197:5-14.
[83] ECF No. 98-13, 206:11-207:9.

23

must determine whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition."

*Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (brackets in original).

Among other arguments, Individual Defendants assert Plaintiff fails to meet her burden because (1) she provides no argument in her response that the law was clearly established, as she improperly relies on her argument contained in her response to co-defendant Hill's motion for summary judgment; and (2) even if the Court were to consider the incorporated arguments, her response fails to meet her burden. The Court agrees.

In her response to Defendants' Motion, Plaintiff improperly incorporates by reference her response (the "Hill Response") to co-defendant Hill's Motion for Summary Judgment. The Court denied Plaintiff's request that she be allowed to do so. (ECF No. 121.) Thus, Plaintiff has no argument – and fails to carry her burden – to show the law was clearly established that each of the Individual Defendants violated her clearly established constitutional right under the facts of this case. For this reason alone, Individual Defendants are granted summary judgment.

But Plaintiff's failure does not stop here. As Individual Defendants argue, in the Hill Response, Plaintiff only addressed the conduct of co-defendant Hill and did not address any of the other Individual Defendants' alleged conduct and how the cases or principles she relies on apply to any of them. Accordingly, the Individual Defendants' Motion is granted as to them.[84] This leaves the *Monell* Claim.

### B.  *Monell* Claim against Defendant Jackson in his official capacity and the ACSO

In her third (and last) claim, Plaintiff seeks to impose municipal liability on Defendant Jackson, in his official capacity, and the ASCO (collectively, "Sheriff"), for the alleged acts of

---

[84] As stated, Plaintiff identifies Defendant Jackson in his individual capacity, but the response brief shows she is suing him in his official capacity, which the Court addresses below.

the Individual Defendants and Defendant Hill. In order to do so, Plaintiff must prove three elements: official policy or custom; causation; and the requisite state of mind. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013). In addition, Plaintiff must first establish a municipal employee committed a constitutional violation. *Myers v. Oklahoma County Bd. Of County Com'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

### 1. Constitutional Violation

Defendants argue the Individual Defendants did not violate the Constitution so there can be no municipal liability. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). In doing so, Defendants refer the Court to Part I.C. of their reply where they argue Individual Defendants are entitled to qualify immunity because Plaintiff fails to show deliberate indifference. The Court finds otherwise.

In *Myers*, *supra*, the Tenth Circuit stated that individual officers receive the protection of qualified immunity while municipalities do not. *Myers*, 151 F.3d at 1317-18. Thus, where a determination of nonliability is based on qualified immunity, that does not foreclose a suit against the municipality, *id*. at 1318. "However, when a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation…a finding of qualified immunity does preclude the imposition of municipal liability." *Jiron*, 392 F.3d at 419 n.8.

In this case, as to Defendants Hill (first claim),[85] Baier (both claims), Heredia (first claim), and Maez (first claim), the Court found there are genuine issues of material fact as to whether they committed a constitutional violation. Thus, the claim against the Sheriff is not foreclosed.

---

[85] For municipal liability, the Court examines all of the individually named Defendants to determine whether liability against the municipality is foreclosed, including Defendant Hill.

### 2.  Policy or Custom

"A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as hat failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation marks, citations, and brackets omitted). Plaintiff's response raises three policies or customs: the failure to train; the failure to supervise; and the policy of providing insufficient medical care in order to save money (hereafter, "policy to save money"). Defendants, however, contend Plaintiff never pled a claim based on any failure to supervise. Upon review of the operative complaint, the Court agrees and rejects Plaintiff's attempt to expand the issues. Accordingly, the Court examines only whether Plaintiff has presented sufficient evidence as to each of the elements for municipal liability based on a failure to train and a policy of saving money.

### a)  Failure to Train

The Supreme Court has stated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (same). And such failure to train must result from "deliberate indifference to the injuries it

may have caused"; deliberate indifference to the need for further training. *Bryson*, 672 F.3d at 788-89.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Bryson*, 627 F.3d at 789. Notice may be established (1) ordinarily, by a pattern of similar constitutional violations by untrained employees; and (2) in a narrow range of circumstances, in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious. *Waller*, 932 F.3d at 1285 (quotation marks and citation omitted). Defendants argue Plaintiff cannot establish any failure to train. The Court agrees.

First, no pattern of similar alleged constitutional violations has been shown. Plaintiff fails to show that any inmate (or inmate going through withdrawal) has given birth at the Jail or a pattern of any pregnant inmates going through withdrawals whom the Jail delayed in providing or denied medical care. Next, Plaintiff fails to show the unconstitutional consequences of any alleged *failure to train* "are highly predictable" and/or "patently obvious." In fact, Plaintiff argues that "[i]t was highly predictable and obvious that Defendant Jackson and ACSO's *practice* would cause an incident such as Ms. Pruitt's."[86] That the Sheriff's *practice* was to deny medical care, in order to save money.[87] Accordingly, summary judgment is granted as to Plaintiff's third claim based on failure to train.

### b)  The Policy or Policies

Plaintiff starts by arguing one policy – the alleged policy to save money. But, although unclear, it appears Plaintiff has two policy arguments. First, the alleged practice of having

---

[86] ECF No. 103, p. 19 (emphasis added).
[87] ECF No. 103, p. 19.

incarcerated pregnant inmates going through withdrawal at the Jail without medical care, which allegedly violates the formal policies the Sheriff purchased and adopted. And, thus, the failure to follow the formal policy constitutes either a failure to train or supervise. And, second, Plaintiff contends the Sheriff adopted a policy to minimize costs of providing healthcare at the Jail, i.e., the policy to save money.

**First Policy.** As to Plaintiff's first alleged policy, the evidence she cites fails to show that was in fact the practice. Instead, as Defendants assert, the evidence shows that if a deputy received a medical complaint from a pregnant inmate going through withdrawal, the deputy could decide no action was needed; address the complaint on his/her own by giving them water; or refer the matter to the nurse or supervisor.[88] And, Plaintiff's conclusion that the "disconnect" between the actual practice and policies purchased by the Sheriff shows there was a failure to train or supervise relies on the general testimony of Defendant Jackson about the distinction between the failure to train versus failure to supervise;[89] which is not an admission as Plaintiff seems to argue.[90] Regardless, any alleged disconnect fails to show such practice as Plaintiff claims. Failing to show any such practice, Plaintiff's claim based on such practice fails.

**Second Policy.** As to the second policy, that too fails. As Defendants argue, Nurse Bleakney testified that the Jail was very supportive of her position, asked her what she needed, and gave her a credit card to order books she needed to do her job.[91] Despite the silence by Defendants, nothing Plaintiff presents sufficiently equates to a policy based on economics. The Sheriff's decision not to spend $500,000 a year to pay a third-party medical provider is not a

---

[88] ECF No. 98-23, 36:6-37:16, 62:2-13. See ECF No. 98-13, 96:11-97:11 (describing practice and discretion, including calling nurse); No. 98-11, 52:22-54:15 (describing discretion and calling supervisor if something out of ordinary was happening if someone is detoxing).
[89] ECF No. 98-25, pp. 122-23.
[90] Further, to the extent this argument is used to show a failure to train, the Court finds any such argument is so cursory as to be insufficient and waived.
[91] ECF No. 98-6, 37:10-38:14.

policy to "be cheap" on medical care. And, even assuming such a policy existed, Plaintiff fails to establish causation.

To establish causation, "the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (quotation marks and citation omitted). Plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (quotation marks and citation omitted).

Plaintiff appears to make two causation arguments. First, Plaintiff argues the policy of minimizing medical costs resulted in the failure to develop and have protocols in place mandating compliance with the Sheriff's purchased policies. Plaintiff cites to OMUSF 24 for the proposition that if the Sheriff did not have a policy of minimizing medical costs and had contracted with an experienced doctor, protocols would have been in place that would have prevented Plaintiff's harm. This citation relies on large part on Dr. Tubb's expert report; but, after agreeing with Defendants' objection, the Court has found such report may not be considered.[92] Plaintiff also relies on Nurse Bleakney's affidavit that she and Dr. Thompson, the medical director of the Jail, were establishing medical protocols but development was delayed because of the volume of work. But, as Defendants argue, the process of revising and conforming the policies was a work in progress; Nurse Bleakney started work at the Jail on October 1, 2016[93] and the events at issue occurred on November 4-6, 2016. There is no evidence the medical protocols which Plaintiff claims should have been in place would have been in place.

---

[92] Moreover, Dr. Tubb's report speaks of the need to comply with NCCHC standards (including referencing a 2018 standard which did not exist at the time of the events in issue), and that the Sheriff's policies are not in line with such standards, i.e., they were allegedly insufficient. (ECF No. 98-21, pp. 6-7.) Thus, even if considered, such report fails to support that mandating compliance with the Sheriff's policies would have avoided Plaintiff's alleged harm.
[93] ECF No. 98-5 at ¶4.

Thus, there is a failure of proof, i.e., the failure to provide sufficient evidence to create a factual issue for a jury to resolve.

Next, Plaintiff argues that if the Sheriff had implemented the purchased policies, she would have gotten timely medical care. This was supposedly based on the Sheriff's "above practices and policies," but which one? The Court has already found there was no policy of not providing medical care as argued by Plaintiff. And, if there was a policy of saving money, the Court has found there is a failure of proof that this caused the purchased policies not to be implemented.

Finally, Plaintiff argues if there was no policy of saving money, and if the Sheriff had hired an outside medical provider, that provider would have implemented protocols that met the standards national organizations have developed for correctional healthcare. Here, again, Plaintiff relies almost exclusively on the excluded expert report of Dr. Tubbs. Plaintiff's reliance on Nurse Bleakney's affidavit fares no better because, as Defendants argue, it does not say what Plaintiff claims it says. Nurse Bleakney does not say that if any deputy had informed her of Plaintiff's symptoms, she would have told the deputy to get Plaintiff to the hospital.[94] Thus, Plaintiff fails to provide sufficient evidence to create a fact issue as to the requirement of causation.

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED**

(1) That Defendants' Motion for Summary Judgment (ECF No. 82) is GRANTED;

(2) That the Joint Motion to Exclude Certain Opinions (ECF No. 123) is DENIED AS MOOT;

---

[94] Compare ECF No. 117, OSUMF at 28, with ECF No. 98-5 (Ex. 5) at ¶10.

(3)  That the Motion to Continue Jury Trial (ECF No. 131) is DENIED AS MOOT;

(4)  That the trial preparation conference and trial are hereby VACATED;

(5)  That the Clerk shall enter JUDGMENT in favor of all Defendants and against

Plaintiff in accordance with this Order and the Order on Defendant Hill's Motion for

Summary Judgment (ECF No. 132);

(6)  That Defendants are awarded costs and shall within 14 days of the date of this Order

file a bill of costs, in accordance with the procedures under Fed. R. Civ. P. 54(d)(1)

and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk; and

(7)  That the Clerk shall close this case.

DATED this 14th day of July, 2020.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

Exhibit 4

| \ | NOV/DEC 2016 | | THU | FRI | SAT | SUN |
|---|---|---|---|---|---|---|
| | TRANSPORTS | HOURS | 11/3/2016 | 11/4/2016 | 11/5/2016 | 11/6/2016 |
| SGT | BRUBACHER | 8A-5P | 8A-5P | 8A-5P | OFF | OFF |
| DEPUTY | JACKSON | 8A-5P | VAC | VAC | OFF | OFF |
| DEPUTY | NAVEAU | 8A-5P | 8A-5P | 8A-5P | OFF | 5A-5P |
| DEPUTY | SMITH | 8A-5P | 8A-5P | 8A-5P | OFF | OFF |
| | ON CALL FOR TRANSPORTS ONLY | | | | Naveau | |
| | DAYS | HOURS | | | | |
| SGT | HIJAR | 9A-5P | 9A-5P | 9A-5P | OFF | OFF |
| DEPUTY | MONDRAGON | 5A-5P | 11A-3P | OFF | OFF | OFF |
| DEPUTY | ATKINS | 5A-5P | 5A-5P | 5A-5P | OFF | OFF |
| CPL | SISNEROS | 5A-3P | 5A-430P | 5A-3P | SICK | OFF |
| DEPUTY | E. MAEZ (FTO) | 5A-5P | 5A-5P | 5A-5P | 5A-5P | 5a-5p |
| DEPUTY | LOBATO | 5A-5P | 5A-530P | 5A-530P | Drill | Drill |
| DEPUTY | GLENN | 5A-5P | OFF | OFF | 5a-530p | 5A-530P |
| DEPUTY | HEREDIA | 5A-5P | | | | |
| | NEW HIRE | | | | | |
| DEPUTY | PETROSS - CONTROL | 7A-5P | 7A-5P | 7A-5P | 7A-5P | OFF |
| | ON CALL DAYS | | GLENN | | | E. MAEZ |
| | | | THU | FRI | SAT | SUN |
| | NIGHTS | HOURS | 11/3/2016 | 11/4/2016 | 11/5/2016 | 11/6/2016 |
| SGT | M. MAEZ | 5P-1A | 5P-1A | 5P-1A | OFF | OFF |
| CPL | STAMBAUGH (FTO) | 9P-7A | OFF | OFF | OFF | 9P-7A |
| DEPUTY | HALL | 5P-5A | OFF | OFF | OFF | 5P-5A |
| DEPUTY | GILLELAND | 10P-8A | 10P-8A | 3P-1A | OFF | OFF |
| DEPUTY | HEREDIA | 5P-5A | 5P-5A | 5P-5A | 5P-5A | 5P-9P |
| CPL | BAIER  (FTO) | 7P-5A | SICK | 7P-5A | 7P-5A | OFF |
| RECRUIT | RODMAN | 7P-5A | | | | |
| DEPUTY | HILL (FTO) | 5P-5A | 5P-5A | 5P-5A | 5P-5A | OFF |
| RECRUIT | DECKER | 5P-5A | 8A-5P | 8A-5P | OFF | OFF |
| DEPUTY | SANCHEZ | 5P-5A | OFF | OFF | 18-2330 | 5P-630A |
| RECRUIT | MORENO-MUNOZ | | 7P-5A | 7P-5A | 7P-5A | OFF |
| | NEW HIRE | | | | | |
| | ON CALL NIGHTS | | SANCHEZ | | | HILL |
| | | | | | | |
| | RECORDS TECH | 7A-4P | | | | |
| | RECORDS TECH | 12P-9P | | | | |



EXHIBIT

Calderwood-Mackelprang

303-477-3800

2/27/18

November 3-6, 2016 Work Schedule 001